UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA
Criminal No. 11-191 (MJD/FLN)

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | GOVERNMENT'S POSITION |
| v. | ) | WITH RESPECT TO SENTENCING |
| | ) | |
| AHMED HUSSEIN MAHAMUD, | ) | |
| | ) | |
| Defendant. | ) | |

The United States of America, by and through its attorneys B. Todd Jones, United States Attorney for the District of Minnesota, Assistant United States Attorneys Charles J. Kovats, Jr., John Docherty, and Department of Justice Trial Attorney William M. Narus hereby submits its position with respect to sentencing of Defendant Ahmed Hussein Mahamud ("Mahamud" or "defendant"). The government anticipates serving and filing a motion pursuant to U.S. Sentencing Guidelines (U.S.S.G.) § 5K. Absent such a motion, the government believes that a Guidelines sentence is appropriate in this case.

## I.    BACKGROUND ON SOMALIA.

At Common Appendix I, the government presents a factual background on Somalia that is relevant to the sentencing proceedings against the following defendants:

*United States v. Mahamud Said Omar*, 09-CR-242 (MJD/FLN)
*United States v. Kamal Said Hassan*, 09-CR-38 (MJD/FLN)
*United States v. Salah Osman Ahmed*, 09-CR-50 (MJD/FLN)
*United States v. Abdifatah Yusuf Isse*, 09-CR-50 (MJD/FLN)
*United States v. Adarus Abdulle Ali*, 09-CR-317 (MJD/FLN)
*United States v. Omer Abdi Mohamed*, 09-CR-352 (MJD/FLN)
*United States v. Ahmed Hussein Mahamud*, 11-CR-191 (MJD/FLN)

This background is provided at Common Appendix I to the sentencing position papers filed in each of the cases described above.

## II. A MINNESOTA PIPELINE OF SUPPORT TO SOMALIA.

At Common Appendix II, the government submits an overview of the description of the offenses, defendants, and facts and circumstances describing the conduct at issue. Like Common Appendix I, Common Appendix II is an identical document submitted in each case described above. The specific conduct of the defendant is set forth in more detail in Section III, B below.

## III. THE CASE AGAINST THE DEFENDANT, AHMED HUSSEIN MAHAMUD

### A. The Charge of Conviction

On February 6, 2012, defendant Mahamud pleaded guilty to Count Three of the Indictment, Conspiracy to Provide Material Support to a Foreign Terrorist Organization, al Shabaab, in violation of 18 U.S.C. § 2339B. This offense carries a statutory maximum sentence of 15 years' imprisonment, a maximum term of supervised release of life, a $250,000 fine, and a $100 special assessment.

### B. The Defendant's Offense Conduct

#### 1. The Factual Basis in the Plea Agreement

The parties stipulated in the plea agreement to the following facts. Between on or about June 2008 and March 2011:

> The defendant became aware of a group of men in Minnesota (hereinafter, "the co-conspirators") who intended to travel from Minnesota to Somalia to fight against Ethiopian troops and the Transitional Federal Government in Somalia. The defendant assisted his co-conspirators by

engaging in fund-raising efforts that enabled his co-conspirators to pay for their travel from Minnesota to Somalia. Specifically, the defendant participated in four separate fund-raising events at locations in both Minneapolis and Eden Prairie, Minnesota. At all these fund-raising events, the defendant and his co-conspirators misrepresented the true beneficiary of the funds collected. Rather than disclose that the money would pay for his co-conspirators' travel to Somalia to join al Shabaab and fight against Ethiopian troops assisting the internationally-recognized Transitional Federal Government, the defendant and his co-conspirators stated that the money collected would be used to help Somali orphans. In total, the defendant and his co-conspirators raised approximately $1,500.00 through these fund-raising efforts.

On or about April 20, 2009, and again on July 27, 2009, the defendant provided Abdikadir Ali Abdi ("Omar") (charged in CR 09-50 (MJD/FLN)) an individual the defendant knew to be a member of al Shabaab, with financial support. Specifically, the defendant provided Omar with $100.00, by means of two wire transfers from the United States to Somalia, to assist Omar with purchasing a firearm. At the time the defendant provided Omar the money, the defendant knew that (1) Omar was a member of al Shabaab, (2) al Shabaab was fighting against Ethiopian troops assisting the internationally-recognized Transitional Federal Government, and (3) al Shabaab had been designated a foreign terrorist organization by the United States Department of State.

On or about April 14, 2010, the defendant, using coded language, asked Nima Ali Yusuf ("Yusuf") for assistance in providing additional financial support to Omar. The defendant and Yusuf knew Omar needed the money to purchase a firearm and that Omar was fighting in Somalia on behalf of al Shabaab. Specifically, the defendant asked Yusuf for "one" which the defendant knew to mean $100.00.

2.      *The Defendant's Statements*

During the course of the investigation, the defendant was interviewed by agents of the FBI and provided information about himself, his knowledge of the conspiracy, and his observations. On or about October 15, 2012, the defendant provided the following sworn testimony when called as a witness in the trial of *United States v. Mahamud Said Omar*

about these same topics.   From these statements of the defendant, the following additional information about the defendant and his relevant conduct is known.

### a.        The Defendant Learns of Omar's Intent to Travel

The defendant was introduced to the conspiracy through his friend, Abdikadir Ali Abdi (*See* Attachment 2, Number "15") whom he met at a local mosque in 2006.   In early 2007, Abdikadir Abdi and the defendant began to discuss the political situation in Somalia and the presence of Ethiopian troops there.   Later, Abdikadir Abdi advised the defendant that he wanted to go to Somalia to join al Shabaab and planned to raise funds so he might be able to do so.   By this time, the defendant was aware that al Shabaab had been designated a foreign terrorist organization and was fighting the transitional government that was trying to rule Somalia.

### b.        The Defendant Joins the Conspiracy

Eventually, Abdikadir Abdi introduced the defendant to some of his friends, including Mohamed Abdullahi Hassan (*See* Attachment 2, Number "10"), Mustafa Ali Salat (*See* Attachment 2, Number "11"), and Abdirashid Ali Omar (*See* Attachment 2, Number "12").   The defendant met all three at the Abubakar As-Saddique mosque and considered all three to be "brothers," or supporters of al Shabaab.   Together, they talked about joining al Shabaab and how to go about collecting the funds to accomplish this goal. Before engaging in fundraising, the defendant met two more "brothers," Troy Matthew Kastigar (*See* Attachment 2, Number "14"), and Burhan Ibrahim Hassan (*See* Attachment 2, Number "17").   This group participated in fund-raising efforts in and around the Twin

4

Cities, falsely representing to would-be donors that the money collected would be used to benefit orphans.

### c.    *The Defendant's Support of Abdikadir Abdi ("Omar")*

After Abdikadir Abdi left the United States to join al Shabaab, he contacted the defendant and asked the defendant for money.   As requested, the defendant sent him $50 on two occasions in 2009, knowing that he intended to use at least some of this money to purchase a weapon.   In early 2010, Abdikadir Abdi again asked the defendant for money but the defendant did not send any.   Instead, the defendant solicited Nima Yusuf (charged in 10-CR-4551-BTM in the Southern District of California), and asked if she could send money to help Abdikadir Abdi.   (*See* Attachment 4, Verbatim Translation of April 14, 2010 Call).

### d.    *Other "Brothers" Described by the Defendant*

In addition to those with whom he raised funds, the defendant also was acquainted with other "brothers" in Minnesota, including Omer Abdi Mohamed (*See* Attachment 3, Letter "AA"), Abdiweli Yassin Isse (*See* Attachment 3, Letter "BB") and Cabdulaahi Ahmed Faarax (*See* Attachment 3, Letter "CC").   The defendant met all three individuals through a friend and "brother" named "Yassin" whom the defendant knew since 2006 and was a vocal supporter of al Shabaab.   According to the defendant, before Abdiweli Isse left to join al Shabaab, he provided the defendant a compact disk containing a lecture from Anwar al-Awlaki that he indicated "was a good lecture."

In addition to Abdikadir Abdi, the defendant has also spoken to Abdiweli Isse and Mohamed Hassan – on each occasion via a conference call through Nima Yusuf – since they joined al Shabaab in Somalia.   Finally, the defendant and Nima Yusuf shared dozens of telephone calls in which the political situation in Somalia, the actions of al Shabaab, as well as the well-being of the men from Minnesota were discussed.

### C.      The Pertinent Guideline Calculations Agreed to By the Parties

In the plea agreement, the parties agreed to the following Guideline calculations:

Base Offense Level, § 2M5.3(a):                    26      (Plea Agreement, para. 6(a))

Acceptance of responsibility, §§ 3E1.1(a), (b):    -3      (*Id.* para. 6(d))

The parties agreed that a two-level increase under § 2M5.3(b)(1)(D) for Providing Money for Commission of Violent Act "may be applicable."   (*Id.* para. 6(b)).

The government reserved the right to argue that a 12-level adjustment under § 3A1.4(a) applies because the defendant's conviction is a Felony Involving or Promoting a Crime of Terrorism.   The defendant reserved his right to argue that this section did not apply.   (*Id*. para. 6(c)).

Finally, the parties agreed that if the adjustment under § 3A1.4(a) applies, the defendant's Criminal History Category would be VI; otherwise, it could be as high as II. (*Id.* para. 6(f)).

## IV.     THE PSR's CALCULATIONS AND RECOMMENDATIONS.

On or about March 21, 2013, the United States Probation Office disclosed the PSR in this case. The PSR calculates defendant's applicable guideline range at 180 months'

imprisonment, based on a total offense level of 37, criminal history category of VI, and a statutory maximum sentence of 15 years' imprisonment. (PSR ¶ 137).

The PSR guideline calculations are summarized as follows:

| | | |
|---|---|---|
| **Base Offense Level, § 2M5.3.1:** | 26 | (PSR ¶ 95) |
| **Specific Offense Characteristics:** Providing money for commission of violent act, § 2M5.3(b)(1)(D): | +2 | (PSR ¶ 96) |
| **Victim Related Adjustments:** Felony involving/promoting crime of terrorism § 3A1.4(a): | +12 | (PSR ¶ 98) |
| Acceptance of responsibility, §§ 3E1.1(a), (b): | -3 | (PSR ¶ 101) |
| **Total Offense Level:** | 37 | (PSR ¶ 102) |
| Criminal History Category: | VI | (PSR ¶ 107) |
| Guideline Range: | 180 months | (PSR ¶ 138) |
| Supervised Release: | Any term up to life | (PSR ¶ 141) |
| Fine: | $20,000-$200,000 | (PSR ¶ 147) |

The PSR also indicates that the information provided does not constitute a recommendation by the USPO for a departure or a variance.

## V.    GOVERNMENT'S RESPONSE TO THE PSR.

### A.    Objections to the PSR

The government has no objections and one amendment to the PSR. As to the description of defendant Ahmed Abdulkadir Warsame (charged in the Southern District of New York) located at paragraph 18 of the PSR, the government would like to add that on December 21, 2011, Ahmed Warsame pleaded guilty to all nine counts of the indictment.

The information relating to Ahmed Warsame's pleas of guilty was not available at the time the PSR was published.

**B.     The Government's Guideline Calculations**

The government agrees with the guideline calculations in the PSR. The government does not believe any other Specific Offense Characteristics or Victim-Related Adjustments are appropriate.   The government also concurs that the appropriate guideline range is 180 months' imprisonment based on a Total Offense Level of 37 and a Criminal History Category of VI.

**C.     The Terrorism Adjustment Under U.S.S.G. § 3A1.4(a) Applies**

The defendant disputes the PSR's correct application of U.S.S.G § 3A1.4(a), the terrorism adjustment, which increases his Offense Level by 12 levels and his Criminal History Category to VI.   The government concurs with the USPO that the terrorism adjustment should apply to this defendant's case.

*1.     Text of the Terrorism Enhancement*

Section 3A1.4 is categorized under chapter three as a victim-related adjustment for terrorism.   Section 3A1.4 was amended in 1996 by the Antiterrorism and Effective Death Penalty Act.

Section 3A1.4 states, in pertinent part, that:

> (a) If the offense is a felony that involved, or was intended to promote, a federal crime of terrorism, increase by 12 levels; but if the resulting offense level is less than level 32, increase to level 32.
>
> (b) In each such case, the defendant's criminal history category from Chapter Four (Criminal History and Criminal Livelihood) shall be Category VI.

There are four application notes to Section 3A1.4. Application Note 1 states that the term "federal crime of terrorism" has the meaning given that term in 18 U.S.C. § 2332b(g)(5). Section 2332b states, in pertinent part:

> (5) the term "Federal crime of terrorism" means an offense that–
>
> > (A)   is calculated to influence or affect the conduct of government by intimidation or coercion, or to retaliate against government conduct; and
> >
> > (B)   is a violation of –
> >
> > > (i)   . . . 956(a)(1) (relating to conspiracy to murder, kidnap, or maim persons abroad), . . . 2339A (relating to providing material support to terrorists), 2339B (relating to providing material support to terrorist organizations) . . . .

Application Note 2 concerns harboring, concealing and obstruction of justice offenses. It states, "For purposes of this guideline, an offense that involved (A) harboring or concealing a terrorist who committed a federal crime of terrorism (such as an offense under 18 U.S.C. § 2339 or § 2339A); or (B) obstructing an investigation of a federal crime of terrorism, shall be considered to have involved, or to have been intended to promote, that federal crime of terrorism."

Application Note 3, which concerns "Computation of Criminal History Category," provides that, "[u]nder subsection (b), if the defendant's criminal history category as determined under Chapter Four (Criminal History and Criminal Livelihood) is less than Category VI, it shall be increased to Category VI." USSG § 3A1.4 cmt. n.3 (2012). Application Note 3 serves as an addendum to § 3A1.4's subsection (b) by clarifying that §

9

3A1.4 does not require a prerequisite criminal history category VI for its application. Application Note 3 provides for the automatic increase of criminal history to category VI. The increase applies to the § 3A1.4 application notes, except for Application Note 4.

Application Note 4 is a stand-alone provision for upward departure, rather than a Section 3A1.4 adjustment, in cases where the defendant's actions do not meet the definition of "federal crime of terrorism" as defined in 18 U.S.C. § 2332b(g)(5). The predetermined increases of offense level and criminal history category that are applicable to § 3A1.4 are not applicable to Application Note 4. The Commission noted that an upward departure rather than a specific guideline adjustment was used because of the infrequency of this type of case and so that the court could assess the harm caused by these offenses on a case-by-case basis.

Viewed in the aggregate, these amendments reflect an understanding by both the Congress and the Sentencing Commission that "an act of terrorism represents a particularly grave threat because of the dangerousness of the crime and the difficulty of deterring and rehabilitating the criminal, and thus that terrorists and their supporters should be incapacitated for a longer period of time." *United States v. Meskini,* 319 F.3d 88, 92 (2d Cir.), *cert denied sub nom. Haouari v. United States*, 538 U.S. 1068 (2003). "We have recognized that 'the Sentencing Commission had a rational basis for creating a uniform criminal history category for all terrorists under [U.S.S.G.] § 3A1.4(b), because even terrorists with no prior criminal behavior are unique among criminals in the likelihood of

recidivism, the difficulty of rehabilitation, and the need for incapacitation.'" *United States v. Stewart,* 590 F.3d 93, 143 (2nd Cir. 2009) (quoting *Meskini, supra,* 319 F.3d at 92).

### 2. Two Theories of Application of the Section 3A1.4 Enhancement

The disjunctive phrases in § 3A1.4 makes clear that the predicate offense must either (1) "involve" a federal crime of terrorism or (2) be "intended to promote" a federal crime of terrorism and that each clause has a separate meaning. The United States has not been able to locate any Eighth Circuit precedent on the application of § 3A1.4.

### a. The "Involve" a Federal Crime of Terrorism Theory

For § 3A1.4 to apply under this prong, the offense must have been "calculated to influence or affect the conduct of government by intimidation or coercion, or to retaliate against government conduct," *and* the offense must be one of those enumerated in § 2332b(g)(5). The government submits that the Court must determine by a preponderance of the evidence that the defendant's offense was "calculated to influence or affect the conduct of government by intimidation or coercion or to retaliate against government conduct." *United States v. Ashqar*, 582 F.3d 819, 824 (7th Cir. 2009) (preponderance of the evidence standard applies to consideration of the terrorism enhancement); *United States v. Awan*, 607 F.3d 306, 317 (2d Cir. 2010); *United States v. Jayyousi*, 657 F.3d 1085, 1115 (11th Cir. 2011). The Court may draw reasonable inferences regarding the intent of defendant's crime based upon the evidence. *See United States v. Mohammed*, 693 F.3d 192, 201-02 (D.C. Cir. 2012) (affirming district court's application of the terrorism enhancement where the court "pointed to specific statements in

the record – which Mohammed does not dispute he made – from which it [the district court] drew plausible inferences); *United States v. Chandia*, 675 F.3d 329, 340-41 (4th Cir. 2012) (affirming application of terrorism enhancement where the court "reasonably inferred by a preponderance of the evidence" that the defendant intended to advance Lashkar's terrorist purpose in providing material support to a leader of Lashkar). Although the Eighth Circuit has not considered the issue of whether the district court must make specific factual findings in order to apply the terrorism enhancement, the government assumes for purposes of this sentencing memorandum that that the Eighth Circuit would follow the example of the Fourth Circuit. *See Chandia*, 675 F.3d at 334 (citing *Chandia I*, 514 F.3d 365, 376 (4th Cir. 2008) (if the sentencing court concludes that the terrorism enhancement is applicable, it was to "identify the evidence in the records that supports its determination").

> **i.** **"Calculated to influence or affect" conduct of government, or to "retaliate against" government conduct**

In *United States v. Awan*, 607 F.3d 306 (2d Cir. 2010), the Second Circuit made clear that for the terrorism enhancement to apply, the law requires a showing only of a specific intent "to commit an offense that was 'calculated to influence or effect the conduct of government by intimidation or coercion, or to retaliate against government conduct.'" *Awan*, 607 F.3d at 317 (quoting 18 U.S.C. § 2332b(g)(5)). The Court has been clear, however, that the statute does *not* require "proof of the defendant's particular motive." *Id.* The defendant's "motive is simply not relevant." *Id.* "[A] person may intend and may

commit an offense that is so calculated even if influencing or retaliating against government is not his personal motivation." *Id.* By way of example, "a person who murders a head of state" commits an act of terrorism if he knows "that his crime will influence or affect the conduct of government . . . even if his particular motivation in committing the murder is to impress a more established terrorist with his abilities." *Id.* In a second example, the Court explained, "A hired assassin who kills a political leader at the behest of a terrorist organization can hardly disclaim that his crime was calculated to influence the conduct of government simply because he was motivated by greed rather than politics." *Id.* at 318.

Thus, the Second Circuit went on to focus on the defendant's knowledge:

> If the evidence showed that Awan engaged in criminal conduct *with knowledge that confederates solicited his actions* to effectuate politically motivated bombings in India, or homicidal attacks on that country's security forces or its political leaders, such proof could demonstrate that Awan's crimes were calculated to influence the conduct of government even if he was not personally motivated by that object.

*Id.* at 317-18 (emphasis added).

The Court noted that the "calculated to influence" language had been referred to by some courts as the "motivational element." The Court explained that, in fact, "the section is better understood as imposing a requirement that the underlying felony [be] calculated to influence or affect the conduct of government by intimidation or coercion or to retaliate against government conduct." *Id.* at 317 (citing *United States v. Stewart*, 590 F.3d 93, 138 (2d Cir. 2009)).

The Eleventh Circuit stated that the Court's analysis "focuses on the intended outcome" of the defendant's crimes – "i.e., what the activity was calculated to accomplish, not what the defendant's claimed motivation behind it was." *Jayyousi*, 657 F.3d at 1115 (citations omitted); *cf. United States v. El-Mezain*, 664 F.3d 467, 571 (5th Cir. 2011) (applying the terrorism enhancement to defendant's conviction for supporting Hamas's fundraising arm because defendant knew Hamas had the goal of influencing government through violent jihad, and the evidence showed that defendant supported that goal).

### ii. *"Conduct of Government" or retaliation for "Government Conduct"*

The "government" affected need not be the government of the United States. Courts have held that a Colombian terrorist group's attempt to influence the government of Colombia met the requirements of the statute. *See United States v. Puerta*, 249 Fed.Appx. 359, 360 (5th Cir. 2007) (*per curiam*) (The court found that § 2332b(g)(5) applied to "Puerta and his co-conspirators [who] sought to trade drugs and money for weapons to supply the United Self Defense Force[s] of Colombia, a designated foreign terrorist organization that opposes the Colombian government."); *United States v. DeAmaris*, 406 F. Supp. 2d 748 (S.D. Tex. 2005) (concluding "the word 'government' as used in § 2332b(g)(5)(A) includes foreign governments and is not limited to the government of the United States" and applying the enhancement to a group opposed to the government of Colombia). Courts have also applied the enhancement with respect to Egypt and Pakistan. *See Stewart*, 590 F.3d at 144 (quoting without disapproval the district court's application of the terrorism enhancement to a defendant whose conduct was "calculated to affect the

conduct of the Egyptian government though intimidation and coercion"); *United States v. Aref,* No. 04-CR-402, 2007 WL 804814, at 2 (N.D.N.Y. Mar. 17, 2007) (finding enhancement applied to conduct calculated to influence or affect President of Pakistan).

The Sixth Circuit applied the enhancement to Hizballah's attempts to influence Israel, disregarding a defense argument that Israel no longer constituted a "government" because it was occupying Lebanon in contravention of international law. *United States v. Assi*, 428 Fed. Appx. 570, 574-75 (6th Cir. 2011). There, the defendant was accused of attempting to provide global positioning satellite modules, night vision goggles, and a thermal imaging camera to a terrorist organization, Hizballah. The Court explained, "Surely Congress did not intend for a United States district court judge to determine whether a foreign state is complying in full with its international obligations before determining whether a person who has pled guilty to providing support to a foreign terrorist organization is subject to § 3A1.4." *Id.* at 575.

### iii.    *The Offense Need Not Be Violent*

In *Assi,* the Sixth Circuit also responded to a defense argument that his crime was not violent. The Court observed that, "Not all of the crimes listed in 18 U.S.C. § 2332b(g)(5)(B) are necessarily violent," citing as examples "1030(a)(1) (relating to protection of computers)," "1030(a)(5)(A) resulting in damage as defined in 1030(c)(4)(A)(i)(II) through (VI) (relating to protection of computers)," "1361 (relating to government property or contracts)," and "1362 (relating to destruction of communication lines, stations, or systems)." *Assi,* 428 Fed. Appx. At 574. Thus, the Sixth Circuit

15

adhered to the plain language of the statute and found "that a non-violent offense can be a federal crime of terrorism." *Id.* The Sixth Circuit held that the terrorism enhancement was not limited to acts of violence; a nonviolent offense could qualify as a "federal crime of terrorism" as defined by 18 U.S.C. § 2332b(g)(5). *Id*.

### b.  The "Intended to Promote" Theory

The Second Circuit has noted that by using the term "intended to promote" the terrorism enhancement casts a "broader net" than the statutory definition alone. *Stewart,* 590 F.3d at 137. In order to satisfy the requirements of the terrorism enhancement, "[t]he criminal conduct at issue need not itself meet the statutory definition of a federal crime of terrorism if 'a goal or purpose [of the defendant's act] was to bring or help to bring into being a crime listed in'" the statutory definition. *Id.* (quoting *United States v. Mandhai*, 374 F.3d 1243, 1247 (11th Cir. 2004). Thus, the "intended to promote" theory applies where the defendant's offense is intended to encourage, further, or bring about a federal crime of terrorism, even though the defendant's own crime of conviction or relevant conduct may not include a federal crime of terrorism." Therefore, in order to apply under the "intend to promote" theory of applicability, "the defendant's offense need not itself be 'calculated' as described in Section 2332b(g)(5)(A)." *Id*.

The Seventh Circuit has upheld the application of § 3A1.4 in a case under the "intended to promote" theory in *United States v. Ashqar.* In that case, the defendant was called before a grand jury and advised the grand jury was investigating alleged terrorist acts of Hamas. *Ashqar*, 582 F.3d at 821. Once before the grand jury, the defendant

16

refused to answer the questions posed to him by the Assistant United States Attorney. *Id.* The defendant was subsequently convicted of obstruction of justice and criminal contempt.[1] *Id.* At sentencing, the district court applied § 3A1.4 and sentenced the defendant to 135 months' imprisonment. *Id.* In upholding the district court's application of § 3A1.4, the Seventh Circuit held the defendant's conduct before the grand jury, namely obstructing an investigation "can be one way of promoting" a federal crime of terrorism. *Id.* at 826. The Court continued,

> Promoting a crime includes helping and encouraging that crime, and one way of furthering a crime is to try to prevent the government from finding out about it. So long as the sentencing court finds that the defendant intended to obstruct an investigation into a federal crime of terrorism, as opposed to an investigation into more ordinary violations of the law, the court has found the intent required to apply § 3A1.4.

> *Id.*

### 3. *Applicability of Section 3A1.4 to the Defendant*

In the present case, the defendant's crime involved a federal crime of terrorism and satisfies the first theory of applicability of § 3A1.4. First, the defendant was convicted of 18 U.S.C. § 2339B, which is among those enumerated offenses listed in § 2332b(g)(5)(A). Second, the defendant's crime was calculated to influence or affect the conduct of the government, specifically, the government of Ethiopia and the Transitional Federal Government.

---

[1] The defendant was also charged with a racketeering conspiracy, in violation of 18 U.S.C. § 1962(d) based on his refusals to testify but was acquitted of these offenses. *Ashqar* at 822.

a. **The Defendant's conduct involved an enumerated "Federal Crime of Terrorism" found at § 2332b(g)(5)(B)(i)**

On February 6, 2012, defendant Mahamud entered a guilty plea to participating in a Conspiracy to Provide Material Support to al Shabaab, in violation of 18 U.S.C. § 2339B. According to 18 U.S.C. § 2332b(g)(5)(B), the offense to which the defendant pleaded guilty is a "Federal Crime of Terrorism" and plainly satisfies the first element of § 3A1.4.

b. **The Defendant's offense was calculated to influence or affect the conduct of government by intimidation and coercion and to retaliate against government conduct**

The defendant's commission of the offenses was also "calculated to influence or affect the conduct of government by intimidation or coercion, or to retaliate against government conduct" and, therefore, satisfies the second and final element of § 3A1.4.

i. *Plea Agreement and Plea Colloquy*

As demonstrated by the facts stipulated to by the parties in the plea agreement and the defendant's underlying conduct, his actions were certainly calculated to have such influence or effect. The defendant knew that al Shabaab would commit acts in Somalia that would constitute acts of terrorism and violence and he knew al Shabaab's openly stated goals and objectives. Mahamud's support included (1) raising money so that would-be fighters could join al Shabaab, (2) sending money to al Shabaab in Somalia on more than one occasion - money that was ultimately intended and destined for, and received by al Shabaab *for the purpose of purchasing a weapon*, (3) soliciting money from others on behalf of a member of al Shabaab, while also participating in discussions about al Shabaab's activities, the training of its fighters, the success or failure of various al Shabaab

18

attacks and operations, the success and failure of Ethiopian and African Union actions in Somalia, and the status of affairs in Somalia regarding the TFG.

For example, on one call with Nima Yusuf on January 3, 2010, he discussed (in coded language) many events with her including: recent fighting in Somalia; the "graduation" of 300 "brothers" from a training camp in Somalia; and the possibility one fighter from Minnesota might achieve martyrdom. (*See* Attachment 4, Verbatim Translation of January 3, 2010 Call).

In a second call on October 3, 2010, the defendant clearly demonstrates his support for al Shabaab, his knowledge of the political situation in Somalia, his opposition to the TFG government, and his desire for political change. Below, the defendant attempts to justify the violence of "the people who are protecting the country" by claiming they are "fighting for their religion."

| | |
|---|---|
| Ahmed: | The people who are protecting the country from the enemy are those who are in the country. The country would have been captured a long time ago. |
| Friend: | Yes, very much so, very much so. |
| Ahmed: | Do you understand? |
| Friend: | Brother, we are indeed each other's enemy. |
| Ahmed: | What? |
| Friend: | Before we talk about other people, we are enemies of one another. Forget about others. You are not fighting against non-Muslims over there, now. |
| Ahmed: | Huh. |

| | |
|---|---|
| Friend: | Right? Someone claims having a religious faith and says "I am a Muslim". You know, and yet he kills his Muslim brothers, cuts their throats, massacres the public and destroys the country. He is not bringing good result. |
| Ahmed: | Now [UI]--there are Muslims who are there… [OV][2] |
| Friend: | [OV] [UI]. What? |
| Ahmed: | There are people who are fighting for their religion. There are people who are fighting for their religion over there, right? |

(*See* Attachment 5, Verbatim Translation of October 3, 2010 Call, page 1).

Later, in the call, the defendant explains the justification for the use of force against

non-Muslims:

| | |
|---|---|
| Ahmed: | I swear, as long as you believe that and you believe in democracy and things like that you will not reach you goal. I swear to God, Muslims will not reach their aim. |
| Friend: | No, I really-I really do not support that non-Muslims stay in our country…and the Ethiopian troops came in the country… |
| Ahmed: | So, what do you support then? |
| Friend: | What? |
| Ahmed: | Tell me what you support. Do you regard only the Ethiopians [as] non-Muslims? Do you regard think [sic] that only the Ethiopians are non-Muslims? |
| Friend: | What? No, first of all those are our enemy, oh my God. But … [OV] |

---

[2] "UI" (Unintelligible) is the translator's note that the words or statements are unintelligible to him or her.
"OV" (Overlapping Voices) is the translator's note that the voices in conversation are overlapping.

| | |
|---|---|
| Ahmed: | You must take them all non-Muslims as your enemies. You must take all non-Muslims as your enemies. |
| Friend: | All non-Muslims are our enemies. None of them is better than the other for us. But, the African troops that are presently there, as I have read on the internet--you know--or saw on the TV news report, are situated in one place and they are limited to that place. However when they are fired upon with artillery, they respond with 12 times more missiles. Who is being hit with all those shelling? It is their people. So, it would be better to resolve the issue politically and to consider the civilians [UI]…to consider it [UI]…to consider it... [OV] |
| Ahmed: | [OV] It will be accomplished by shooting and by force. |
| Friend: | --to consider... [OV] But, if they fire on them and they panic and fire in response, who will dies your own people. You should be concerned for you people--[OV]. |
| Ahmed: | [UI] and it will be done by shooting and by force [OV]. |

(*Id.* at 12-13).

Thereafter, the defendant makes clear his low opinion of the TFG president, and criticizes his decision to invite in Ethiopian troops to stabilize his government in the face of al Shabaab attacks.

| | |
|---|---|
| Ahmed: | So, what are they doing now? What are they doing now? This guy who claims to be the president, what is he doing? Is he taking the non-Muslims as his protectors? Didn't he invite the non-Muslims? |
| Friend: | Oh my God. But, brother … [UI] |
| Ahmed: | They are non-Muslims. Anyone who follows the non-Muslims is a non-Muslim. |

(*Id.* at 15).

Still later in the same call, the defendant declares both the TFG government and "anyone who supports it" to be "apostate."

| | |
|---|---|
| Ahmed: | This government is apostate and it is non-Muslim. Anyone who supports it is the same--they are non-Muslims too. Do you understand? |
| Friend: | Well, not really. I cannot say that now. But, both side… [UI] May God give us a fair government. |
| Ahmed: | I swear to God- I swear to God anyone who supports the apostate government is the same as them. |

(*Id.* at 21.)

That the defendant was well-versed about al Shabaab and the governments (such as the government of Ethiopia and the TFG) that were operating in the region and the affect or influence that al Shabaab had on those governments and the civilian population is well settled. The defendant well knew that al Shabaab was dedicated to overthrowing the internationally-recognized government of Somalia, and ousting Ethiopian and African Union troops. The defendant's intercepted calls show that he shared these goals with al Shabaab. The facts definitively demonstrate that the defendant intended to "influence or affect the conduct of government by intimidation or coercion, or to retaliate against government conduct" (1) when he raised funds to facilitate the travel of fighters to join al Shabaab; (2) when he provided funds to a member of al Shabaab whom he knew was going to purchase a weapon; and (3) when he solicited funds from Nima Yusuf so a member of al Shabaab could purchase additional arms.

In sum, "element one" is satisfied because the offense for which the defendant was convicted, a violation of 18 U.S.C. § 2339B, is a "federal crime of terrorism." "Element two" is satisfied because the defendant's admitted role in the offense, his knowledge and support of al Shabaab, and his statements and actions leave no ambiguity regarding his intent to support al Shabaab and al Shabaab's goals, and therefore were intended and calculated "to influence or affect the conduct of government by intimidation or coercion, or to retaliate against government conduct." As such, the "terrorism adjustment" under § 3A1.4 must apply.

## VI. ABSENT ANY ADDITIONAL MOTIONS, THE COURT SHOULD SENTENCE THE DEFENDANT TO A GUIDELINE SENTENCE.

In *Gall v. United States* the Supreme Court set forth the appropriate sentencing methodology: the district court calculates the advisory Guidelines range and, after hearing from the parties, considers the 18 U.S.C. § 3553(a) factors to determine a sentence sufficient, but no greater than necessary, to achieve the goals of 18 U.S.C. § 3553. 552 U.S. at 38, 49-50 (2007); *United States v. Ruvalcava-Perez*, 561 F.3d 883, 886 (8th Cir. 2009) ("In sentencing a defendant, the district court should first determine the appropriate Guidelines range, then evaluate whether a traditional departure is warranted, and finally decide whether or not to impose a guideline sentence after considering all the § 3553(a) sentencing factors").

The district court may not assume that the Guidelines range is reasonable, but instead "must make an individualized assessment based on the facts presented." *Gall, 552 U.S.* at 50. If the court determines that a sentence outside of the Guidelines is called for, it

"must consider the extent of the deviation and ensure that the justification is sufficiently compelling to support the degree of the variance." *Id.* Section 3553(a) requires the Court to analyze a number of factors, including, "the nature and circumstances of the offense," "the history and characteristics of the defendant," "the need for the sentence to reflect the seriousness of the offense," "the need for deterrence," "the need to protect the public from further crimes of the defendant," and "the need to avoid unwarranted disparities." 18 U.S.C. § 3553(a).

**A.     Nature and Circumstances of the Offense.**

As described in the plea agreement and PSR, the defendant provided material support to the foreign terrorist organization al Shabaab, through three separate endeavors. First, he joined a group of young men in raising money from innocent members of the Somali-American community in both Minneapolis and Eden Prairie in the summer of 2008. He did so knowing that the money raised would be used to facilitate the travel of the next group of men to Somalia to fight against the TFG and AMISOM peacekeepers. Further, he helped raise this money by lying to the donors about the true purpose of the money raised. (PSR ¶ 62).

Second, the defendant sent money to a member of al Shabaab in Somalia on two occasions in 2009; money that was ultimately intended and destined for, and received by al Shabaab. Further, he did so knowing that at least some of the money would be used to purchase a weapon for a member of a foreign terrorist organization. (PSR ¶ 62). Using a hawala, the defendant sent the money to Somalia under an alias.

24

Third, in April of 2010, the defendant solicited money from co-conspirator Nima Yusuf on behalf of the same member of al Shabaab so that al Shabaab might acquire additional weapons.   (PSR ¶ 62).

These acts of the defendant must not be considered in a vacuum.   During the nearly two-year period that encompassed the defendant's criminal conduct, he participated in dozens of discussions with Nima Yusuf and others about al Shabaab's activities, the success or failure of various al Shabaab violent attacks and operations, the success or failure of Ethiopian and AMISOM actions in Somalia, and the status of affairs in Somalia regarding the TFG.   The defendant knew members of al Shabaab referred to one another as "brothers" and then considered himself a "brother."   The defendant was well versed about al Shabaab and their operations in Somalia.   On several occasions, he communicated directly with members of al Shabaab in Somalia.   As described above, he discussed current al Shabaab actions in Somalia with Nima Yusuf, including the "graduation" of 300 brothers from a terrorist training camp.

Among the violent acts conducted by al Shabaab understood by the defendant to have occurred in Somalia was the suicide bombing perpetrated by Shirwa Ahmed, a U.S. citizen from Minneapolis, in October 2008.   This unequivocal declaration of the horrors to be unleashed by al Shabaab on the citizens of Somalia - and those present in Somalia to protect the citizens - did not serve to deter the defendant from his support of the terrorist organization.   Indeed, when a member of al Shabaab, Abdikadir Abdi, asked the

defendant for money, the defendant twice supported him financially. On the third occasion, he sought money from Nima Yusuf.

Simply put, the nature and seriousness of the defendant's crimes, including conspiring to provide support to those who seek to kill Somali government officials, Ethiopian soldiers and AMISOM peacekeeping troops, and United Nations officials overseas, weigh strongly in favor of a Guidelines sentence in this case. *See* 18 U.S.C. § 3553(a)(1) and (a)(2)(A).

### B. History and Characteristics of Defendant.

As stated above, the defendant was born in Mogadishu, Somalia, in 1985; left Mogadishu in 1991 to escape the civil war and lived under difficult conditions in a refugee camp in Kenya with his parents and siblings until late 1999 when he entered the United States at age 14. (PSR ¶ 112). After graduating from Eden Prairie High School, he attended Normandale Community College for approximately one and one half years. The defendant became a naturalized U.S. citizen in 2006. (PSR ¶ 115). The defendant is married and, together with his wife, has three young children. (PSR ¶ 113). The defendant has no criminal history other than traffic-related infractions. (PSR ¶¶ 105-109).

In mitigation and to his credit, when first approached by the FBI about his role in the offense, the defendant admitted that he sent money to Abdikadir Ali Abdi knowing he was a member of al Shabaab. Although the defendant initially denied his role in fundraising for the 2008 travelers and minimized the scope of his knowledge of the conspiracy, he soon provided a full, truthful accounting of his role in the conspiracy to the government.

Moreover, the defendant did accept responsibility for his criminal actions by pleading guilty well short of trial. Further, the defendant has performed well while on supervised release.

However, these mitigating factors are outweighed by the fact that the defendant, through his words, deeds, and personal associations, was a committed supporter of al Shabaab until his arrest. The defendant supported al Shabaab knowing that it conducted suicide bombings in Somalia and other means of force and violence and was designated a foreign terrorist organization by the country that provided him citizenship after leaving war-torn Somalia.

### C. The Need for the Sentence Imposed to Reflect the Seriousness of the Offense, to Promote Respect for the Law, and to Provide Just Punishment for the Offense.

The defendant committed extremely serious crimes when he knowingly conspired to provide material support to al Shabaab. Considering the seriousness of this crime, promoting respect for the law and providing just punishment are important factors in this case. As the Supreme Court has recognized, "combating terrorism is an urgent objective of the highest order." *Holder v. Humanitarian Law Project*, 130 S.Ct. 2705, 2724 (2010).

Sophisticated terrorist plots, such as those used by al Shabaab to both sustain itself and commit acts of terror, require multiple participants performing different roles. The fact that defendant played a supporting role does not make his crime any less serious or unimportant. Indeed, when enacting § 2339B as a distinct criminal offense, Congress made specific findings regarding the serious threat posed by international terrorism and the

networks that provide support to those who commit acts of terrorism. Congress determined, and the Supreme Court has recognized, that terrorist organizations, such as al Shabaab, "are so tainted by their criminal conduct that any contribution to such an organization facilitates that conduct." *Id.* (quoting AEDPA §§ 301(a)(1)-(7), 110 Stat. 1247). The Supreme Court further explained that enforcing § 2339B "furthers this international effort [to combat terrorism] by prohibiting aid for foreign terrorist groups that harm the United States' partners abroad." *Id.* at 2726.

Further, although the defendant has no appreciable criminal history and this offense represents his first criminal conviction, his participation in this criminal conspiracy cannot be viewed as a discrete event occurring at a singular place and time. Far from doing a favor for a friend on a single instance, the defendant repeatedly took steps to provide material support, over the course of years, to a terrorist organization. In fact, the defendant remained an active member of the conspiracy for nearly two years. Not only did he frequently discuss al Shabaab and the Minnesota "brothers" with Nima, he also spoke with her about the ongoing FBI investigation, discussed who had been subpoenaed to testify before the Grand Jury, and otherwise maintained a high degree of awareness about the government's investigation. When doing so, the defendant used coded language to describe the FBI such as "Faduma Bashir Ibrahim," or shortened "Faduma Bashir" and "shaydamada," meaning "devils" in the Somali language, that was widely used by the members of the conspiracy. Despite his awareness of both the designation of al Shabaab as a foreign terrorist organization and the FBI's criminal investigation, the defendant

remained committed to his "brothers" and their criminal conspiracy. In so doing, the defendant demonstrated that his respect for his conspirators' goals outweighed his respect for the law.

The government respectfully submits that the Court consider the seriousness of defendant's support to al Shabaab, which has committed numerous acts of terrorism against the government of Somalia, its citizens, and those who have sought to provide relief and comfort to its citizens, including the United Nations and the African Union. A substantial term of imprisonment, therefore, is necessary to reflect the seriousness of defendant's violation of § 2339B and to promote respect for the law.

      **D.**    **The Need for the Sentence to Afford Adequate Deterrence to Criminal Conduct, and the Need for the Sentence Imposed to Protect the Public from Future Crimes of This Defendant.**

In this case, there is a need for both individualized and general deterrence. Individualized deterrence is that which discourages a defendant from ever committing such a crime again. General deterrence is the public response necessary to deter other people from committing similar crimes. "Congress specifically made general deterrence an appropriate consideration . . ., and we have described it as 'one of the key purposes of sentencing.'" *Ferguson v. United States*, 623 F.3d 627, 632 (8th Cir. 2010) (quoting *United States v. Medearis*, 451 F.3d 918, 920 (8th Cir. 2006)).

Terrorists and terrorist organizations rely upon support from individuals for their success in carrying out specific attacks, as well as their continued existence. The sentence imposed in this case needs to disabuse individuals from believing that they can sit at a safe

distance, lend support to the violent aims of terrorists and terrorist organizations, and be free from detection or punishment. In the District and State of Minnesota, which has seen a proliferation of cases involving young men traveling to join al Shabaab, this is no small interest. To date, neither the designation of al Shabaab as a foreign terrorist organization nor prosecution of the men who joined al Shabaab and those who have supported them, have completely stemmed the flow of support to the foreign terrorist organization from Minnesota. The government respectfully requests the Court strongly consider the impact on both this defendant and the broader community when imposing an appropriate sentence.

Further, the harm that material support to international terrorism causes is of grave concern. *Humanitarian Law Project,* 130 S.Ct. at 2724 (upholding the constitutionality of §2339B: "the Government's interest in combating terrorism is an urgent objective of the highest order."). A substantial sentence is necessary to deter individuals, like the defendant, from believing that simply because they do not pick up a gun or attend a training camp, they do not facilitate terrorism. As the Supreme Court has recognized:

> 'Material support' is a valuable resource by definition. Such support frees up other resources within the organization that may be put to violent ends. It also importantly helps lend legitimacy to foreign terrorist groups – legitimacy that makes it easier for those groups to persist, to recruit members, and to raise funds – all of which facilitate more terrorist attacks.

*Id.* at 2725.

Given the compelling need to deter the continued threat that home-grown terrorists and those that support them pose to the United States and our allies, a Guidelines sentence would send a clear message to any would-be jihadists that the abhorrent criminal conduct

seen in this case is not tolerated by the U.S. government. A Guidelines sentence also sends a strong but fair message of deterrence by signaling that those who send money and personnel to aid foreign terrorist organizations can and will be prosecuted.

      **E.**    **The Kinds of Sentences Available, the Need to Avoid Disparities and the Sentencing Guidelines and Related Policy Statements.**

Within the last three years, numerous defendants have been sentenced in federal district court for providing, or attempting to provide, material support to al Shabaab, or related offenses. At Common Appendix III, the Court will find a short description of each case, the offense(s) of conviction, and the sentence handed down by the respective district courts.

Within the current cases pending sentencing before this Court, the government believes the Court should note the following facts that could serve to distinguish this defendant from some of the other defendants, (1) the defendant did not travel to Somalia to join al Shabaab; (2) the defendant did not have a leadership role in the offense; (3) the defendant pleaded guilty well before trial (though other defendants did resolve their cases in even more expeditious fashion); and (4) the defendant has been a good performer while on supervised release.

The Guideline sentencing range for the offense to which the defendant pleaded guilty would be 360-Life but for the limitation provided by the 180-month statutory maximum. Absent any motion from the government related to the defendant's sentence, the government believes that a sentence within the Guideline range is appropriate and necessary to satisfy the factors described in 18 U.S.C. § 3553(a).

Dated: April 19, 2013                    Respectfully Submitted,

                                         B. TODD JONES
                                         United States Attorney

                                         *s/ John Docherty*
                                         _____
                                         CHARLES J. KOVATS, JR.
                                         JOHN DOCHERTY
                                         Assistant United States Attorneys

                                         *s/ William M. Narus*
                                         _____
                                         WILLIAM M. NARUS
                                         Trial Attorney
                                         U.S. Department of Justice