UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA
Criminal No. 11-191 MJD

_____

UNITED STATES OF AMERICA,
                Plaintiff,

v.                                   POSITION OF THE DEFENDANT WITH
                                   RESPECT TO SENTENCING FACTORS

Ahmed Hussein Mahamud,
                Defendant.
_____

The Defendant, by and through his attorney, submits the following position of the defendant with respect to sentencing factors that the Court should consider in determining what type and length of sentence is sufficient, but not greater than necessary, to comply with the statutory language set forth in 18 U. S. C. § 3553(a) and pursuant to the Local Rule.

### AHMED MAHAMUD HAS ACCEPTED RESPONSIBILITY

David Hanners, in the Pioneer Press news story of February 6, 2012, entitled *Ex-Eden Prairie man pleads guilty to role in Somali terrorism case,* wrote that Ahmed Mahamud "admitted that in the summer of 2008, he and co-conspirators raised as much as $1,500 for airfare and other expenses for the men the FBI calls "the travelers." He and others solicited money from members of the local Somali-American community, telling would-be donors the funds were for a local mosque or for helping orphans in Somalia, a country left a shambles after two decades of civil war, failed governments, clan rivalries, drought at famine. He also admitted that on two occasions, in April and July 2009, he wired $50 payments to one of the local men

1

who had traveled to Somalia. In April 2010, he used "coded language," according to the plea agreement, to get another person to wire another $100 to the man."

When Ahmed Mahamud pled guilty, he accepted responsibility for what he did.  When Ahmed Mahamud testified at trial, he accepted responsibility.

Mr. Hanners continued: *As money goes, Ahmed Mahamud's contribution to the $100-million-a-year terrorism operation of al-Shabaab was tiny - he helped raise perhaps $1,500 for the group, and had a hand in wiring $200 to a man in Somalia.*

Ahmed Mahamud and I first met on March 10, 2011.  I have represented him for over two years.  He is a young man who was born in Somalia, raised in Kenya and the United States who is deeply committed to his religion and naturally interested in his place of birth.  I have met his family who continue to love and support him.   He and I have talked often.  We have participated in many meetings with the United States.  Today, he is older and wiser, married, and a father of three.  Ahmed Mahamud was not and will not be a threat to the United States.  He was a young man troubled by the civil war in Somalia and alarmed by the invasion of the Ethiopians. He is not a terrorist.

I remain concerned that the United States may seek a punitive sentence for Mr. Mahamud because of his speech and thoughts not for his acts.

I remain concerned that the United States in its investigation into Mr. Mahamud has listen to speech between citizens and between a citizen and his lawyer without any meaningful disclosure or explanation of those actions.

Mr. Mahamud does understand the seriousness of the offense and the need of this court to

impose just punishments for the offense to him and to the others that this court is sentencing. He understands that this court will consider a sentence for him and for the others that will act as deterrence to similar criminal conduct in his community. He hopes that the court believes that it will not need to protect the public from him in the future. We hope that the trial has helped the reconciliation in the Somalia community.

What is the measure of justice in this sentencing? The other defendants may present the historical foundation of religion, patriotism and self-sacrifice that Americans have given to others. They are likely to discuss the history of animosity between Ethiopia and Somalia and the Diaspora of many Somalia families from their homeland and for some to the United States.

We trust that this court has an understanding that Ahmed Mahamud did not participate in the recruitment of young men to fight in Somalia. We hope that this court believes that Ahmed Mahamud's involvement was the result of that recruitment. We do not believe that the sentencing of Ahmed Mahamud should be used to set an example for planners or facilitators. We hope that his sentencing will reflect reconciliation and not unforgiving punishment.

Thomas Fuller, the seventeenth century English clergyman who lived during the English civil wars, spoke of such reconciliation when he wrote: *He that cannot forgive others breaks the bridge over which he must pass himself; for every man has need to be forgiven.*

### INDIVIDUAL ACTS AND RELATIVE CULPABILITY

Mr. Mahamud does not fall within any of the categories the Presentence report writer chose to describe the participants.

He was not a facilitator as described in paragraphs 59 and 62. Those facilitators convinced the travelers to fight a jihad in Somalia, bought airline tickets for them, drove the

travelers to the airport, drove the travelers across the border, raised money, spoke with leadership of al Shabaab in Somalia, traveled themselves to Somalia, and showed no acceptance of responsibly and lied to the grand jury. We object to the inclusion of Mr. Mahamud with the others.

The description in paragraph 62 of Mr. Mahamud as facilitating the travel of young men is wrong. He was excluding from the planning and facilitation because he decided not to travel to Somalia.

Mr. Mahamud was not a traveler as described in paragraphs 67 to 69 nor a fugitive or Fighter as listed in paragraphs 70 to 82. The travelers were the target of the conspiracy. He chose not to travel to Somalia. He accompanied his friend Omar when Omar and others raised money and later sent money to his friend Omar in Somalia.

The definition of *facilitate* is to make easier or to help bring about. Mr. Mahamud did not facilitate anything. His role in the fundraising and the sending of money to Omar in Somalia was *tiny* and acts of friendship and curiosity, not facilitation. The term facilitate conveys the opposite of the casualness of his role. The haphazard and spontaneous nature of the fundraising is mischaracterized by the verb facilitate.

Mr. Mahamud did not facilitate the travel of young men to Somalia as suggested by paragraph 96. He was instead one of the young men that the planners and facilitators recruited to travel to Somalia. When he decided not to go, he was excluded from any planning and facilitation.

The conclusion of paragraph 99 that Mr. Mahamud was an average participant is wrong. The definition of the adjective *average* equals an arithmetic mean, being about midway between extremes, or not out of the ordinary. Mr. Mahamud's role and actual participation was minor

because it was inferior in importance, size, or degree and comparatively utterly unimportant. His participation was minor because he gave a little bit of help to a friend who was determined to travel to Somalia without or without his help.

Mr. Mahamud was not a member of al-Shabaab and does not knows Ahmed Abdulkadir Warsame who commanded hundreds of al-Shabaab fighters or Anwar al-Awlaki, a U.S. citizen and a senior leader in al-Qaeda in the Arabian Peninsula, as others in Minnesota do. He was not asked to corroborate the information that Mr. Warsame gave to intelligence organizations. He was not visited in the United States by foreign intelligence organizations seeking information. He does not know the proprietors in Somalia where the travelers and facilitators stayed or the trainers in the camps.

The presentence report partially addressed our concern on page A.1 in the response to our objection by acknowledging, "it is clear that there are more culpable defendants". Then, the presentence report argued in its denial of a minor role "it is difficult to see the defendant as anything other than an average participant." That opinion means for this court's guideline calculation that a young man who was recruited into this crime, but who did not travel, and later chose to send money to his friend who did travel has the same culpability and the same responsibility as those who left the United States and fought in Somalia. Ahmed Mahamud's limited knowledge is reflected his role. David Hanners called his role tiny. The presentence report should have read "it is difficult to see the defendant as anything other than a minimal or minor participant."

Both the guidelines and this circuit require that a comparison of the acts of each defendant in relation to the relevant conduct that he is accountable for, each defendant's individual acts, and relative culpability against the elements of the offense to determine a

downward adjustment. United States v. Goebel, 898 F.2d 675, 677 (8th Cir. 1990) and United States v. Padilla-Pena, 129 F.3d 457, 471 (8th Cir. 1997).  See also USSG § 3B1.2, Application Note 3.

Mr. Mahamud did not plan any travel, did not buy airline tickets, did not convince anyone to go, did not drive anyone to the airport, and did not attend any farewell dinner.  He knew nothing of the travel arrangements or the goodbyes.  He did not travel to Somalia.  He did not visit the travelers in Somalia. He did not attend an al Shabaab training camp.  He did not fight in Somalia.  The facts of the other defendants' participation do not support the claim that Mr. Mahamud had an average role.  Likely, many of the presentence reports of the other defendants consider them average yet they are far more culpable than Mr. Mahamud.  The claim that he had an average role is to cast an arbitrary extraordinary capricious wide net. The totality of the circumstances requires this Court to find that such a minimal or minor role adjustment is justified.

THE CRUDE TERRORISM ENHANCEMENT IS NOT APPROPRIATE

Paragraphs 98 and 107 applied a 12 level terrorism enhancement.  The terrorism enhancement treats all the defendants who are being sentenced in this series of cases the same.  Such a mechanical application of the guidelines would give each defendant an identical sentence for disparate conduct.

The Honorable George A. O'Toole, Jr. spoke of the consequences of such a theory: "*regardless of the particular facts* (in a terrorism case*) not only make the recommendation unuseful as a guide in a particular case but is actually, in my view, contrary to and subversive of the mission of the Guidelines which is to address with some particularity the unique facts of the*

*given case. And gross adjustments such as the ones I've referenced do not do that. Moreover, the automatic assignment of a defendant to a Criminal History Category VI is not only too blunt an instrument to have genuine analytical value, it is fundamentally at odds with the design of the Guidelines. It can, as it does in this case, import a fiction into the calculus. It would impute to a defendant who has had no criminal history a fictional history of the highest level of seriousness. It's one thing to adjust the offense level upward to signify the seriousness of the offense. It is entirely another to say that a defendant has a history of criminal activity that he does not, in fact, have."* April 12, 2012 sentencing hearing in United States v. Tarek Mehanna, in the District of Massachusetts No. 09-10017-GAO at page 69.

The description of Mr. Mahamud's as a "facilitator" is wrong and the imposition of terrorism enhancement on material support conviction for him is wrong because his conduct was insufficient to show he intended to promote or was involved in a federal crime of terrorism. United States v. Stewart, 590 F. 3d 93, 136-39 (2d Cir. 2009.)  The presentence report has not given this court sufficient reason to show that Mr. Mahamud's motive in providing material support was to influence or affect government conduct by intimidation or coercion, or to retaliate against government conduct.  United States v. Chandia, 395 F. App'x 53 (4th Cir. 2010) ("Chandia II").

The presentence report, at page A.2 in the response while affirming the enhancement, agreed that this court "can vary from the advisory guidelines, pursuant to 18 U.S.C. § 3553(a), to account for the unique circumstances of this case and defendant."  As the presentence report stated *there are defendants that are more culpable*.

The 3A1.4 enhancement is categorized as a victim related adjustment for terrorism and in

the Presentence Report the "victims" are from the Somalia community in Minnesota. That reasoning suggests that the "victims" are the young men who were recruited to travel to Somalia.

The rationale of a 3A1.4 enhancement is that terrorism defendants have a likelihood of recidivism because terrorists "with no prior criminal behavior are unique among criminals in the likelihood of recidivism, the difficulty of rehabilitation, and the need for incapacitation." United States v. Stewart, 590 F.3d 93, 143 (2nd Cir. 2009), citing United States v. Meskini, 319 F.3d 88, 92 (2d Cir.), cert. denied, 538 U.S. 1068, 123 S.Ct. 2240 (2003).

In the Violent Crime Control and Law Enforcement Act of 1994, Pub. L. 103-322 (1994, and the Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA), Pub. L. 104-132, Congress directed the Sentencing Commission to amend its sentencing guidelines to provide an *appropriate* enhancement for any felony that involves a Federal crime of terrorism.

Mr. Mahamud is unlikely to be a recidivist of any kind of crime including terrorism. His true criminal history category is I. Sentencing reductions for first offenders are supported by the recidivism data and should recognize their lower re-offending rates. "Measuring Recidivism: The Criminal History Component of the Federal Sentencing Guidelines" at p. 15 (May 2004).

Mr. Mahamud's acceptance of responsibility and cooperation with the government including testimony at a facilitator's trial reflect a reduced likelihood of recidivism and further offending. Mr. Mahamud's post offense rehabilitation clearly shows that he will not fail at rehabilitation and that he does not need incarceration.

The crude terrorism enhancement is contrary to the mission of the guidelines, which is to address with some particularity the unique facts of each case. The automatic assignment of Mr. Mahamud to a Criminal History Category VI is too blunt to have genuine value and it is fundamentally at odds with the design of the guidelines. It gives Mr. Mahamud who has had no

criminal history a fictional history at the highest level of gravity. While offense levels are adjusted upward and downward to signify the seriousness of the offense, it is absurd to say that Mr. Mahamud has a history of criminal activity that he does not, in fact, have.

The two-step terrorism enhancement is not *appropriate* for Mr. Mahamud because not all terrorism defendants with no prior criminal behavior are likely to reoffend, to fail in rehabilitation, and to need incapacitation. There is no empirical evidence to justify such an adjustment as *appropriate* for Mr. Mahamud.

Koon v. United States, 518 U.S. 81, 98, 116 S. Ct. 2035, 135 L. Ed. 2d 392 (1996) held that: *"It has been uniform and constant in the federal judicial tradition for the sentencing judge to consider every convicted person as an individual and every case as a unique study in the human failings that sometimes mitigate, sometimes magnify, the crime and the punishment to ensue."*

The offense level in paragraphs 102 and 138 should be reduced from 37 to 21.  His criminal history in paragraph 107 and 138 should be I.  His guideline range in paragraph 138 should be 37-46 months before consideration of departures and variances.

The Presentence Report fails to see Mr. Mahamud as an individual and lumps him together with so-called facilitators and planners who are unrepentant, more culpable, and were more involved than he ever was in the recruitment of young men to travel to Somalia.

We object to the inclusion of Mr. Mahamud in paragraph 51 and to the description of Mr. Mahamud in paragraph 62 suggesting that he planned and facilitate the travel of young men.  Mr. Mahamud was one of the young men whom the others attempted to recruit to travel to Somalia.

He did not participate in the planning and facilitation and, because he chose not to go to Somalia, he was excluded from knowing of the specific plans.

POST OFFENSE REHABILITATION

The Presentence report cursorily mentions in paragraph 152 that Mr. Mahamud has significant post offense rehabilitation. The Statutory Mission of the Sentencing Reform Act of 1984 provides for the development of guidelines that will further the basic purposes of criminal punishment: deterrence, incapacitation, just punishment, *and rehabilitation.*

Mr. Mahamud is now married with three children. He is living and working in Columbus, Ohio despite the disruption to his family that this case brought on after his marriage.

In paragraph 129, when Mr. Mahamud was terminated from the Columbus Neighborhood Health Center he was not told the reason. He does not believe he was difficult at work. About two months ago, a relative of his learned from employees of the health center that he was terminated following contact with the health center by the FBI during its investigation of him.

He is an older and changed man with family responsibilities that he did not have to 2008-2010. Paragraph 2 supports his rehabilitation because he "has been in compliance with all bond conditions." We note that paragraph 116 should reflect that there have been many contacts at his home by pretrial services in Columbus described in paragraph 2.

There is, quite clearly, substantial post offense rehabilitation by Ahmed Mahamud. Please see letters from family and friends that we believe will be mailed to the court in support of Mr. Mahamud.

He is a man with family responsibilities that he did not have in 2008 to 2010.

Paragraph 2 supports his rehabilitation because he "has been in compliance with all bond conditions." We would note that paragraph 116 should reflect that there have been frequent contacts at his home by pretrial services in Columbus.

Mr. Mahamud regrets his actions, has confessed them to this court, and asks forgiveness. He has shown reconciliation with his community.

This is a case where religion, history and politics came together. In Luke 17:4, it is written: "If he sins against you seven times in a day, and seven times comes back to you and says, 'I repent,' forgive him." Forgiveness and reconciliation are justice.

### PROBATION IS A SUBSTANTIAL RESTRICTION OF FREEDOM

Mr. Mahamud is not likely to reoffend. He had a minor role. He has accepted responsibility. He has cooperated with the United States. He has significant post offense rehabilitation.

We concerned with his family responsibilities. We believe that a prison sentence would adversely affect his family.

Mr. Mahamud would respectfully ask you to consider an alternative to incarceration, a downward departure and a probationary sentence. His fifteen-month pre-indictment conduct and his eighteen-month pretrial release have shown that he will comply with all conditions of probation.

*Probation*, rather than an act of leniency, *is a substantial restriction of freedom*. While custodial sentences are qualitatively more severe than probationary sentences of equivalent terms, offenders on probation are nonetheless subject to several standard conditions that substantially restrict their liberty.

Probationers may not leave the judicial district, move, or change jobs without notifying, and in some cases receiving permission from their probation officer or the court. They must report regularly to their probation officer, permit unannounced visits to their homes, refrain from associating with any person convicted of a felony, and refrain from excessive drinking.

Most probationers are also subject to individual "special conditions" imposed by the court. Gall v. United States, 128 S. Ct. 586; 169 L. Ed. 2d 445 (2007).

Justice Alito in his dissent in Gall concurred: "If the question before us was whether a reasonable jurist could conclude that a sentence of probation was sufficient in this case to serve the purposes of punishment set out in 18 U.S.C. § 3553(a)(2), the District Court's decision could not be disturbed."

A sentence of probation will reconcile the community and Ahmed Hussein Mahamud and the statutory directives set forth in 18 U. S. C. § 3553(a).

Kazuo Ishiguro described such reconciliation and rehabilitation of Ahmed Hussein Mahamud when he wrote, "Perhaps one day, all these conflicts will end, and it won't be because of great statesmen or churches or organizations like this one. It'll be because people have changed."

Dated:  April 19, 2013          Respectfully submitted,

                                *s/ Rick E. Mattox*
                                _____
                                Rick E. Mattox, Attorney I.D. No. 0068731
                                Attorney for Defendant
                                Franklin Trail Office Building, Suite 250
                                16670 Franklin Trail
                                Prior Lake, MN  55372

952/469-2299